IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| AUDREY CROSS, | ) | |
| Plaintiff | ) ) ) | |
| vs. | ) ) | CASE NO. CV00-HGD-3649-S |
| GOLD KIST, INC., | ) ) ) | |
| Defendant | ) | |

**ENTERED**
DEC 2 0 2002

## MEMORANDUM OPINION

The above-entitled civil action is before the court on the motion for summary judgment filed by defendant, Gold Kist, Inc. [Doc. #29]. The parties have consented to the exercise of jurisdiction by the undersigned United States magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73, Fed.R.Civ.P. Briefs and evidentiary submissions have been filed by the parties, and the court has reviewed them.

### FACTUAL BACKGROUND

Plaintiff, Audrey Cross, began working for Gold Kist in 1982 at its Trussville, Alabama, poultry processing plant. In 1994, she was promoted to the position of supervisor in the broiler evisceration department. A department supervisor such as plaintiff is supervised by a unit manager. Unit managers are supervised by shift supervisors and who, in turn, are supervised by shift superintendents. Plaintiff was supervised by unit manager Steve White (White)

until June 2000. From 1998 until June 2000, James Holley was the shift superintendent over White.

According to plaintiff, she became pregnant in 1999 and asserts that after Holley found out about her preganancy, he began to harass her. [Cross Depo. at 168]. She states: "In October (1999), I complained to Bobby Elrod.[1] September, I used to tell Steve (White) that Mr. Holley was picking on me." [*Id.* at 83]. Cross does not recall if she told White anything other than Holley was "picking on" her in September 1999. [*Id.*].

She testified that at some point, she told White she wanted to file a harassment complaint against Holley, but she does not recall when this occurred. [*Id.*]. According to Cross, White told her that he would not do that "if I were you." [*Id.* at 83-84]. He also told her that Holley did not like her because he thought she was lazy and did not want to do what she was told.

When asked if she told White what Holley was doing that she thought was "picking on" her, she responded that she found herself "having to do a lot of things other supervisors didn't have to do," [*id.* at 84], such as monitor the "draw-hands." When asked if she told White any other way that Holley was picking on her except having her "monitor the draw-hands," she replied "not in September." [*Id.* at 92]. At this time, Holley was White's boss. [*Id.* at 152].

---

[1] Bobby Elrod is Gold Kist's Human Resources Manager.

In her affidavit, Cross states that after Holley found out she was pregnant, she was singled out and treated differently based on her "refusal to go along with James Holley's sexual advances." [Cross Affid. at ¶ 3]. However, in her deposition, she admits Holley never asked her out or to engage in any physical contact with him, never tried to kiss or hug her, and never asked her to engage in sexual relations. [Cross Depo. at 282, 284-85]. Carolyn Pointer also states that she and Cross complained in Fall of 1999 about Holley harassing Cross. However, she states that the harassment took the form of Holley closely checking on Cross's work. She does not state that it was sexual in nature. [Pointer Affid. at ¶ 4].

On another occasion, before Cross took maternity leave, Holley told her what he liked in a woman and made reference to a Smoky Mountains tee shirt she was wearing, stating he "came to see the Smoky Mountains." [Cross Depo. at 283-84]. She never reported this comment to anyone. [*Id.* at 284].

Plaintiff asserts that on November 18, 1999, Holley denied her vacation scheduled for December 20-24, 1999, while a male employee was permitted to take the vacation time. [Pl. Exh. 16]. After Christmas 1999, she claims that Holley asked her if she "gave up any for Christmas." [Pl. Exh. 17]. She also claims that on two occasions when she was sick during her pregnancy, Holley and White refused to let her take sick leave and required her to take a vacation day. [Cross Depo at 153-56]. She was told she could not take such leave

unless she went to a doctor. Plaintiff stated that she had not wanted to go to a doctor; she just wanted to go home and lie down. Because she was not going to a doctor, she was required by Holley to take vacation leave instead of sick leave. [*Id.* at 154-55]. Cross states she complained about this to Bobby Elrod but that nothing ever was done about it. [*Id.* at 158]. There was a second occasion during her pregnancy when White told Cross she could not leave unless she was going to a doctor. Plaintiff then asked Holley, who told her she could leave if she took vacation leave. [*Id.* at 160-61]. Cross did not complain to anyone about this second instance. [*Id.* at 161].

Plaintiff was on maternity leave from February to May 2000. [Cross Depo. at 143-44]. Plaintiff asserts that upon her return on May 9, 2000, Holley ran his finger down her cleavage. [Pl. Exh. 5]. Approximately a week later, she states that Holley called her into the unit manager's office and, when she leaned over to look at something, Holley brushed a piece of chicken product off her chest. She states that she hit his hand and told him she would clean herself off. [*Id.* at 197-98, 200]. He used one finger to sweep it off. [*Id.* at 200]. When asked if she thought Holley's action was sexually motivated, she stated, "Well, I felt like he was just cleaning it off, but I did hit his hand." [*Id.* at 294]. She later added, "I mean, I had to think something was sexual about it to hit him on the hand tell him not to do it." [*Id.* at 295]. In her subsequent statement to Bobby Elrod, Cross states she did not think Holley's action was

4

sexual in nature. [Pl. Exh. 5]. She never reported either of these incidents until she was interviewed by Bobby Elrod on July 5, 2000, when she was called in for an interview regarding other employees' complaints concerning Holley. [*Id.* at 269-70, 290-91; Elrod Decl. at ¶ 7].

Cross also claims Holley made her fry chicken for him and other supervisors at the plant. [Cross Depo. at 183-97]. She acknowledges that he never threatened her to get her to cook and concedes that other employees liked her to cook for them also. [*Id.* at 195-96]. Plaintiff never complained to management at Gold Kist about having to cook. [*Id.* at 197, 270]. Cross also complains that Holley put his hands on her hips or rear in May 2000 in order to get by her. [Plaintiff's Answers to Interrogatories at ¶ 5; Cross Depo. at 201-02]. She also never reported this incident to anyone. [Cross Depo. at 270].

Plaintiff also alleges that she was singled out for discipline as the result of her refusal to submit to Holley's "advances." [Complaint at ¶¶ 7, 8]. However, the only discipline she reports receiving is an incident where she was written up twice within a few minutes for failure to wear a safety glove and then written up for disorderly conduct when she refused to sign the disciplinary report. [Pl. Exhs. 12, 13]. However, these reprimands were administered by White–not Holley–and, despite plaintiff's claims to the contrary, there is no evidence White took this action at the direction of Holley.

Plaintiff also complains that Holley asked her if she had a boyfriend, stated he did not take herbs because that is "for men who can't get it up," constantly called her over the loudspeaker, dreamed up extra paperwork for her to do, and required her to train her own "lead person." [Plaintiff's Answers to Interrogatories at § 15]. However, plaintiff never complained about these actions to anyone in management.

These matters only came to the attention of Gold Kist management because on June 30, 2000, Beverly Smith reported to Bobby Elrod that she was being harassed by Holley and that he was also harassing other Gold Kist employees, including Carolyn Pointer. As a result, Elrod interviewed the complainants, one or more of whom identified plaintiff as a potential victim. [Elrod Decl. at ¶ 17]. Elrod interviewed plaintiff on July 5, 2000. It was at that time that plaintiff reported the incidents where Holley put his finger down her cleavage and brushed chicken fat off her breast. After Elrod's investigation, Holley was demoted and transferred to another facility. Plaintiff still works for Gold Kist and received a pay raise in 2000. [Cross Depo. at 218].

Prior to December 1999, Gold Kist's sexual harassment policy provided that a person who has reason to believe that he or she has been subjected to sexual harassment <u>should</u> report such incidents to management. [Pl. Exh. 11]. In December 1999, that policy was changed to provide that a person who believes he or she has been harassed <u>is required</u> to report such incident to

management. [Cross Depo. at Exh. 1]. That policy provides that no employee will be subject to unsolicited or unwelcome sexual advances or conduct, either verbal or physical. It further provides that all reports of sexual harassment are to be investigated. [*Id.*] A list of persons to whom a report of harassment could be made was provided, and plaintiff was aware of the list. [Cross Depo. at 228-31].

In February 2000, plaintiff participated with other supervisors in training regarding the prevention and reporting of sexual harassment. [*Id.* at 232-34 and Exh. 2]. Plaintiff has received similar training each year that she has been a supervisor. [*Id.* at 238-39]. The then-current anti-harassment policy was distributed at each of these training sessions. [*Id.* at 244-45]. It included toll-free numbers to call in order to make harassment complaints.

### DISCUSSION

This matter is considered by the court pursuant to the provisions of Rule 56, Fed. R. Civ. P. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Thus, summary judgment

is appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

*Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in her favor. *Id*. at 255, 106 S.Ct. at 2514, citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). It is, therefore, under this standard that the court must determine whether the plaintiff can meet her burden of coming forward with sufficient evidence as to each material element of his claim sufficient to permit a reasonable jury to find in her favor.

Sexual Harassment

Until recently, sexual harassment cases generally were placed in two categories: (1) *quid pro quo*, "based on threats which are carried out" or fulfilled, and (2) hostile environment, based on "bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 582 (11th Cir. 2000) (*quoting Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 751, 118 S.Ct. 2257, 2264, 141 L.Ed.2d 633 (1998)). However, the method of analyzing harassment cases was altered somewhat in the United States Supreme Court's decisions in *Ellerth* and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275 141 L.Ed.2d 662 (1998).

The extent of an employer's liability for discriminatory or harassing conduct by an employee now depends, to a great degree, on the status of the employee within the company. For instance, when a non-supervisory employee harasses a co-employee, then, if the harassment is such that the employer knew or should have known that it was occurring, the employer is liable for the harassment unless it took prompt action to remedy the problem. *See Ellerth*, 524 U.S. at 751, 118 S.Ct. at 2264; *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1368 (11th Cir. 1999). In other words, the employer is liable for employee-on-employee harassment only if it is negligent in discovering or failing to promptly remedy the problem when it comes to its attention. *Ellerth*, 524 U.S. at 758-59, 118 S.Ct. at 2267.

The rules are different if the harassing co-worker is also a supervisor. If the harasser is a supervisor but the harassment has not resulted in "tangible job action," then the employer may nevertheless be held liable if the harassment is sufficiently severe and pervasive to alter the terms and conditions of employment, subject to an affirmative defense set out below. *Ellerth,* 524 U.S. at 751, 118 S.Ct. at 2264. On the other hand, if the supervisor's harassment has resulted in a tangible job action, the employer is vicariously liable for the supervisor's actions, and no affirmative defense is available. *Faragher, supra*. That affirmative defense "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and

correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807, 118 S.Ct. at 2293; *Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270.

A tangible job action is one of major consequence, such as hiring, firing, transfer, demotion and the like. *See Faragher*, 524 U.S. at 790, 118 S.Ct. at 2284. Plaintiff was not subject to any of these events.[2] Thus, it is necessary to determine if the harassment was sufficiently severe and pervasive to have altered the terms and conditions of plaintiff's employment, thereby creating a sexually hostile environment.

Requiring a plaintiff to prove this element is necessary to ensure that Title VII does not become a mere "general civility code." *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283-84. This requirement is regarded "as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace–such as male-on-male horseplay or intersexual flirtation–for discriminatory 'conditions of employment.'" *Gupta*, 212 F.3d at 583 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998)).

---

[2] The incidents where plaintiff was written up twice for not wearing a safety glove and then for disorderly conduct when she refused to sign the discipline notice do not rise to the level of a tangible job action. She never was demoted, denied promotion, nor had her pay cut as a result. In fact, later that year, she received a 4% pay raise.

11

In order to establish this factor, a plaintiff must not only establish that she subjectively perceived the environment as hostile and abusive, but also that such a perception is objectively reasonable; that is, that a reasonable person would perceive the environment to be hostile and abusive. *See Faragher,* 524 U.S. at 788, 118 S.Ct. at 2284; *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999).

Although plaintiff's failure to report most, if not all, of the alleged harassment may indicate that she did not find her environment to be subjectively hostile and abusive, plaintiff states that she did. Since the evidence in a motion for summary judgment is considered in the light most favorable to the non-moving party, *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), it is assumed that Cross, in fact, subjectively perceived her environment to be hostile and abusive.

Regarding the objective prong of this element, the statements and conduct complained of are examined collectively to determine whether they are sufficiently pervasive or severe to constitute sexual harassment. *See Mendoza,* 195 F.3d at 1242. While some of Holley's comments and actions are crude and distasteful, there is no evidence that he tried to pressure plaintiff to engage in sexual relations with him, a fact which plaintiff acknowledges. In undertaking this analysis, the Court will, nevertheless, assume that the conduct and statements made by Holley were sexual in nature.

When the complained-of conduct or statements are of a sexual or gender-related nature, there are four factors that are considered in determining whether they are sufficiently severe and pervasive from an objective standpoint to alter an employee's terms and conditions of employment:

> (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.

*Mendoza*, 195 F.3d at 1246. A plaintiff must show more than the "mere utterance of an . . . epithet which engenders offensive feelings in an employee" to establish a violation of Title VII. *Meritor Savings Bank, FSB, v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). Although the actions recounted by plaintiff undoubtably were annoying and offensive, many decisions throughout the circuits have rejected sexual harassment claims based on actions that are as serious or more serious than the conduct at issue here. *See Shepherd v. Comptroller of Public Accounts of Texas*, 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that several instances over a two-year period, including the comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support a hostile environment claim); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (holding that statement that plaintiff had the "sleekest ass" in the

office plus a single incident of "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of plaintiff's employment); *Adsumilli v. City of Chicago,* 164 F.3d 353, 357 (7th Cir. 1998) (holding actions insufficient to support a hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1365-66 (10th Cir. 1997) (holding five sexually-oriented, offensive statements over 16 months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can."); *Hopkins v. Baltimore Gas & Electric Co.,* 77 F.3d 745, 753-54 (4th Cir. 1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding , and stared at him in the bathroom" insufficient to establish Title VII violation); *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 823-24 (6th Cir. 1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated

sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, there's "Nothing I like more in the morning than sticky buns;" suggesting that land area be named as "Titsville" or "Twin Peaks;" asking plaintiff; "Say, weren't you there [at biker bar] Saturday night dancing on tables?"; stating, "Just get the broad to sign it"; telling plaintiff she was "paid great money for a woman"); *Weiss v. Coca-Cola Bottling Co. of Chicago,* 990 F.2d 333, 337 (7th Cir. 1993) (holding plaintiff's claims-supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blond, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once in a bar and twice at work—were not sufficient for actionable sexual harassment); *see also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment."); *Gupta, supra* (plaintiff's superior called her at home two to three times a week, asked her personal questions, touched the inside of her thigh, unbuckled his pants and pulled down his zipper to tuck in his shirt in front of her, lifted the hem of her dress, and suggested that he should spend the night with her).

The conduct of Holley was relatively infrequent (plaintiff was not even at work from February until May 20000 because of maternity leave). The conduct

15

was not severe; though one or two incidents could be construed as humiliating (the "Smoky Mountains" incident and the incident where it is alleged Holley put his finger down her cleavage), they were not physically threatening and, as noted below, Holley's conduct did not affect her ability to do her job.

In order to prove the existence of a hostile work environment, a plaintiff must "demonstrate that the actions of the defendants altered the conditions of the workplace, creating an objectively abusive and hostile atmosphere." *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995). Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted). Plaintiff has outlined three incidents of touching and a few off-color remarks as the only sexually-related conduct. By her own admission, this did not affect the way she did her job. [Cross Depo. at 220-21].

Likewise, plaintiff has no evidence that she was disciplined for failure to wear a safety glove because of her sex. She admits that she was not wearing a safety glove as required but points out that Carolyn Pointer was present and had no safety glove but was not disciplined. However, since both are female, that fact does not bolster her case. In addition, this discipline was initiated by

White. Plaintiff has presented no evidence, other than her own subjective belief, that Holley had anything to do with this incident.

Likewise, there is no evidence to lead one to conclude that the reason Holley kept close tabs on her was sexually related. Plaintiff was told that she needed to stay out on the floor more. One time she was told this directly, and one time it was a directive given to all the supervisors. [*Id*. at 142, 148-50]. Thus, there is no evidence that she was singled out because of her sex. Furthermore, regarding her complaint that Holley made her write up job descriptions for her lead people, plaintiff acknowledges that she only had to do so for two people and that the whole exercise took less than 30 minutes. She bases her conclusion that no one else had to do this on the fact that no one else told her that they had done so. [*Id.* at 174-75]. There is simply nothing in this evidence from which one could conclude that this directive was sexually motivated.

Plaintiff also complains about having to take a vacation day when she was sick while pregnant, which she feels was a violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601, *et seq.* [*Id.* at 152-64]. However, the FMLA specifically allows an employer to require employees to use paid vacation leave in conjunction with FMLA leave, and it is Gold Kist's policy to require this. [Elroy Decl., Exh. 2 at 13]. In any event, plaintiff has no evidence that any other employee, male or female, was treated any differently. [Cross Depo. at

164]. Thus, the undersigned magistrate judge concludes that plaintiff has failed to show that the sexual harassment by Holley was severe and pervasive so as to alter the terms of her employment.

Gold Kist also asserts the affirmative defense put forth in *Faragher*, which requires a showing that (a) the employer exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. 524 U.S. at 777-78, 118 S.Ct. at 2278-79. Gold Kist had in place a sexual harassment policy and procedures for reporting the same. The only time plaintiff complained to anyone about Holley's "harassment" was during the Fall of 1999 when she complained to White and Elrod that Holley was "picking on" her and she found herself "having to do a lot of things other supervisors didn't have to do." [Cross Depo. at 84]. She did not testify that she ever told White or Elrod that Holley was harassing her sexually. Gold Kist cannot be considered to have been on notice where the plaintiff has failed to explain the "full dimensions" of the harassment. *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1301 (11th Cir. 2000).

In any event, all of the offensive touching and many of the remarks came after plaintiff returned from maternity leave. Regardless of when they occurred, plaintiff acknowledges that she never made a complaint of *sexual*

harassment pursuant to the Gold Kist anti-discrimination policy because she "didn't trust the system." [Cross Depo. at 270-71]. Therefore, plaintiff unreasonably failed to take advantage of Gold Kist's procedures for reporting harassment. See *Madray*, 208 F.3d at 1302. Furthermore, when this activity was reported to defendant in June 2000, it took action to stop the harassment, including demoting and transferring Holley. For these reasons, plaintiff cannot prevail. See *id.* at 1302-03; *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996).

Based on the foregoing analysis, the court concludes that defendant's motion for summary judgment is due to be granted and this action dismissed with prejudice. A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this 20th day of December, 2002.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE